IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| DONNA R. BALDWIN, | CASE NO. 1:22-cv-2077 |
| Plaintiff, | DISTRICT JUDGE |
| | JOHN R. ADAMS |
| vs. | |
| | MAGISTRATE JUDGE |
| COMMISSIONER OF THE SOCIAL | JAMES E. GRIMES JR. |
| SECURITY ADMINISTRATION, | |
| | **REPORT &** |
| Defendant. | **RECOMMENDATION** |

Plaintiff Donna Baldwin filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In December 2019, Baldwin filed an application for Disability Insurance Benefits alleging a disability onset date of October 1, 2017,[1] and claiming she

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

was disabled due to migraines, chronic neck pain, right arm limitations, depression, cervical spinal arthritis, and degenerative disc disease. Tr. 24, 189, 353. The Social Security Administration denied Baldwin's application and her motion for reconsideration. Tr. 68, 78. Baldwin then requested a hearing before an Administrative Law Judge (ALJ). Tr. 121.

In August 2021, an ALJ held a hearing. Baldwin and a vocational expert testified. Tr. 46–66. The next month, the ALJ issued a written decision finding that Baldwin was not disabled. Tr. 24–39. The ALJ's decision became final on September 12, 2022, when the Social Security Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Baldwin filed this action on November 17, 2022. Doc. 1. She asserts the following assignments of error:

> 1. Whether the Administrative Law Judge committed a reversible error by finding that Plaintiff's carpal tunnel syndrome and depression were not severe impairments.

> 2. Whether the Administrative Law Judge's residual functional capacity assessment is supported by substantial evidence.

> 3. Whether the Administrative Law Judge failed to adequately address the signs and symptoms of Plaintiff's migraines.

Doc. 9, at 1.

**Evidence**

*1.     Personal and vocational evidence*

Baldwin was born in 1967 and was 50 years old on her alleged disability onset date. Tr. 69. She graduated from high school and last worked in 2019 at

a fast-food restaurant. Tr. 45.

### 2.    *Medical evidence*[2]

In November 2017, Baldwin went to the emergency room for lower abdominal pain. Tr. 492. She denied dizziness, weakness, numbness, and headaches. Tr. 493. Baldwin was diagnosed with a kidney stone, which was removed about a week later. Tr. 497, 517–18.

In October 2018, Baldwin went to the emergency room for a migraine. Tr. 703. She said that she had taken two doses of her medication, Imitrex, without relief. Tr. 703. She described her pain as diffuse, dull, and throbbing and reported nausea and vomiting. Tr. 703. Upon exam, Baldwin was alert and oriented and appeared distressed and in "obvious pain." Tr. 705. Her affect and judgment were normal. Tr. 705. Baldwin received Dilaudid and Reglan injections, which resolved her pain. Tr. 707.

In January 2019, Baldwin went to the emergency room for a migraine, which wasn't responding to her medications because she couldn't keep her medications down due to vomiting. Tr. 698. She rated her pain a 10 out of 10. Tr. 698. A treatment note states that Baldwin was "histrionic, yelling out, moaning, and crying constantly," and she was described as "very hysterical due to discomfort." Tr. 698. Baldwin's exam findings showed that she was oriented, appeared distressed, and had a normal affect. Tr. 700. She had a normal

---

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

musculoskeletal and neurological exam. Tr. 700. Baldwin was treated with Reglan, Benadryl, and Dilaudid and "markedly improved after medication and rest." Tr. 700, 702.

In February 2019, Baldwin went to the emergency room for a migraine, nausea, and vomiting. Tr. 692. She reported that she was experiencing her fourth migraine that week and that she took Imitrex twice, without relief. Tr. 692. The treatment note states that Baldwin was crying and "rocking." Tr. 692. Baldwin stated that her primary care physician treated her headaches. Tr. 692. Baldwin explained that her headaches had increased in frequency and intensity when, two months before the visit, she stopped taking Topamax because it caused her to develop kidney stones. Tr. 692. Upon exam, Baldwin had a normal range of motion in her neck and "musculoskeletal" areas, full strength in her hands, normal motor skills, a normal gait, and normal grip strength. Tr. 695. She was alert, oriented, and had a normal mood. Tr. 695. Extensive neurological exam findings were normal. Tr. 695. Baldwin was treated with Zofran, Benadryl, and Toradol, which "somewhat improved" her symptoms. Tt. 696. Her discharge note stated that she had "no hard neurological findings." Tr. 696. Baldwin was advised to follow up with her primary care provider "for continued adjustment of medication as needed." Tr. 696.

Two days later, Baldwin saw her primary care doctor Michael James Hayes, M.D. Tr. 835. A treatment note states that Baldwin had been assessed

with vascular headaches, which "tend[ed] to occur once a month" but were becoming more frequent. Tr. 835. Baldwin reported that Imitrex provided relief, but her insurance carrier limited how much she could obtain. Tr. 835. Dr. Hayes increased Baldwin's Elavil to 30 mg and her Imitrex to 100 mg. Tr. 835–36.

In March 2019, Baldwin saw neurologist Sumalya Zehra Salim, M.D., for her migraines. Tr. 1133. Baldwin reported that her migraines occurred, on average, four times per month. Tr. 1133. Dr. Salim's exam findings showed that Baldwin had full strength in all areas of her arms and legs and normal reflexes and fine-touch sensation. Tr. 1136–37. Dr. Salim noted that a 2015 brain MRI had been normal. Tr. 1137. Baldwin told Dr. Salim that she had stopped taking non-steroidal anti-inflammatory drugs (NSAIDs), which had previously helped her migraines, because she "had been advised to avoid NSAIDS due to prior overuse of th[em]." Tr. 1133–34. Dr. Salim suggested that Baldwin try taking ibuprofen, an NSAID, on a restricted basis since it had helped her before. Tr. 1133. Dr. Salim also wrote that Baldwin could consider increasing her Elavil or Imitrex. Tr. 1133.

Three days later, Baldwin saw Dr. Hayes for a follow-up. Tr. 841. Baldwin said that she was taking an increased dose of Elavil, after seeing Dr. Salim, and that she was doing better. Tr. 841. Dr. Hayes assessed Baldwin's vascular headaches as "presently … excellent." Tr. 841.

In April 2019, an x-ray of Baldwin's cervical spine showed moderate degenerative disc space narrowing at C4-5,[3] "endplate degenerative changes of moderately prominent posterior spondylitic changes which could be causing some central canal stenosis," and some minor neural foraminal narrowing bilaterally but no severe encroachment. Tr. 554.

In May 2019, Baldwin followed up with Dr. Hayes, who described Baldwin's headaches as "stable." Tr. 864. Later that month, Baldwin reported that she was getting more headaches, which, she believed, were caused by her neck pain. Tr. 870. A cervical spine MRI showed moderate discogenic disease at C5-6 and a small central disc extrusion causing mild spinal canal stenosis. Tr. 560. Baldwin had a small disc bulge at C3-4 causing mild spinal canal stenosis, stable mild spinal canal stenosis at C4-5, and mild a rotary levoconvex scoliosis (a curvature) of the cervical spine with multilevel discogenic disease and moderate facet arthropathy on the right at C5-6 and C6-7. Tr. 560.

On July 9, 2019, Baldwin went to the emergency room for a headache. Tr. 686. She also reported nausea and neck pain, which radiated to her right arm. Tr. 686. Baldwin stated that she had physical therapy for her neck the

---

[3]     Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, M.D., *Vertebrae in the Vertebral Column, Spine-health Resources*, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT].

day before the visit. Tr. 686. She had taken her headache medications without relief. Tr. 686. Upon exam, Baldwin was oriented and appeared to be in distress. Tr. 689. She had pain with neck movement. Tr. 689. Baldwin received medication, which relieved her headache, but her neck was still uncomfortable. Tr. 689. Two days later, Baldwin returned to the emergency room for a migraine. Tr. 682. Her pain was mainly behind her right eye and was constant and moderate-to-severe in nature. Tr. 682. Baldwin explained that the night before her visit she had a mild headache that gradually worsened. Tr. 682. She also complained of nausea and denied confusion, fever, chills, and weakness in her arms or legs. Tr. 682. During her physical exam, Baldwin was lying in a dark room with a washcloth across her forehead. Tr. 684. The doctor's exam findings showed that Baldwin was awake, alert, calm, and cooperative. Tr. 685. She was treated with fluids and Reglan, Denadryl, Toradol, and Decadron. Tr. 685. She was discharged home with advice to follow up with her primary care provider. Tr. 685.

A week later, Baldwin followed up with Dr. Hayes. Tr. 886. Baldwin reported that her headaches had been "acting up recently" but were "somewhat better" after taking a muscle relaxer and Tylenol. Tr. 886. Dr. Hayes wrote that Baldwin's headaches were "most likely aggravated by her neck problem" and commented that Baldwin had a cervical spine surgery scheduled with Dr. Crowell. Tr. 886.

In early September 2019, Baldwin went to the emergency room for a "frontal headache behind the eyes" that had lasted for 24 hours. Tr. 676. Baldwin also had nausea and light sensitivity. Tr. 676. Her medications—Sumatriptan, Ibuprofen, Benadryl, and nausea medication—hadn't helped and she had vomited throughout the day before her visit. Tr. 676. Baldwin denied weakness and facial asymmetry. Tr. 676. Upon exam, she was oriented, had a normal affect, and appeared distressed. Tr. 679. She was treated with Benadryl, Reglan, and Dilaudid injections, which resolved her headache. Tr. 679–80. The doctor commented that Baldwin "was not faring well with oral sumatriptan as a rescue agent for her migraines" and that Baldwin wanted to try subcutaneous injections, which the doctor prescribed. Tr. 680. Baldwin also said that Zofran worked better for her nausea, so the doctor provided some to her. Tr. 680.

Two days later, Baldwin had a pre-surgical clearance exam. Tr. 587. She reported numbness in her arms and a history of headaches. Tr. 587. Baldwin's musculoskeletal and neurologic findings on exam were normal. Tr. 588. Baldwin was cleared for surgery, and Dr. Crowell performed an anterior cervical decompression and fusion at C5-6 with plate and allograft. Tr. 1028–30. A post-surgical x-ray showed "a satisfactory post-operative appearance following the plate fixation." Tr. 616.

In late October 2019, Baldwin saw Dr. Hayes for a follow-up after her surgery. Tr. 914. Baldwin said that she was "doing better" but that "every so

often, especially when she use[d] her right arm, she aggravate[d] it." Tr. 914. "When her arm pain act[ed] up, the headaches act up." Tr. 914. Dr. Hayes wrote that Baldwin was progressing "slowly" and instructed her to be cautious with respect to activity. Tr. 914.

In mid-December 2019, Baldwin saw Dr. Hayes, who escorted her to the emergency room for a psychiatric evaluation due to "concerns of mental health issues" after Baldwin had told Dr. Hayes that she had thoughts of harming herself due to her pain issues. Tr. 645, 650. At the emergency room, Baldwin denied that she would act on those thoughts. Tr. 645. She was frustrated by her "current care" for her neck pain. Tr. 645. Her neck pain caused chronic migraines. Tr. 645. Upon exam, Baldwin was alert and oriented and had normal behavior. Tr. 649. She denied any mental health history. Tr. 653. Baldwin was discharged and advised to follow up with her medical providers "to address her pain concerns." Tr. 655.

On January 9, 2020, Baldwin saw Dr. Hayes for frequent headaches and nausea. Tr. 2627. Baldwin reported having 16 migraines in December 2019 and six so far in January. Tr. 2627. She said that Butalbital Acetaminophen was ineffective and that, while Imitrex was effective, she only received nine pills a month. Tr. 2627. Baldwin also reported pain in her neck, upper back, and right shoulder, and that her pain caused insomnia. Tr. 2627. She couldn't "do anything" and was "exhausted from pain." Tr. 2627. Dr. Crowell had prescribed Ambien for Baldwin's insomnia, but it didn't work. Tr. 2627.

Baldwin was using a neck brace and experienced "a fair amount of discomfort," especially when moving her right shoulder. Tr. 2634. Dr. Hayes assessed Baldwin's depression as "stable." Tr. 2635. He commented that it was difficult to tell whether Baldwin's right shoulder pain was coming from her neck or her shoulder. Tr. 2635. Dr. Hayes thought that Baldwin's shoulder pain seemed "more radicular" but referred Baldwin to an orthopedist to check her shoulder "just to be cautious." Tr. 2635. Dr. Hayes commented that Baldwin's shoulder pain was "quite incapacitating … to the point where she ha[d] difficulty sleeping." Tr. 2635. As for Baldwin's headaches, Dr. Hayes stated that they were likely being aggravated by her neck, and that Baldwin's medication needed to be adjusted. Tr. 2635.

On January 17, 2020, Baldwin saw an orthopedic doctor for her right shoulder pain. Tr. 667. Baldwin also reported right-hand numbness about four days a week. Tr. 667. Baldwin's exam findings showed that she was in no acute distress and fully oriented. Tr. 668. In her neck, Baldwin had a well-healed incision, full flexion, significantly limited extension, and good rotation. Tr. 668. A Spurling's test, indicating cervical spine radiculopathy, was negative. Tr. 668. Baldwin had a full range of motion in her shoulder, with upper trapezial and periscapular pain with end-range elevation. Tr. 668. She had good rotator cuff strength and "perhaps 4+ out of 5 strength in her right bicep distally." Tr. 668. "Otherwise," Baldwin was "neurovascularly intact." Tr. 668. The doctor reviewed Baldwin's right shoulder x-rays and noted that they showed no bony

abnormality. Tr. 668. The doctor opined that Baldwin's shoulder pain and right-hand numbness were more consistent with a cervical nerve root issue, not a shoulder condition. Tr. 667. He suggested that Baldwin call Dr. Crowell's office for an earlier follow-up appointment. Tr. 667.

The next day, Baldwin went to the emergency room. Tr. 669. She had been vomiting that morning, which then caused a migraine. Tr. 669. Her migraine medications hadn't provided relief. Tr. 669. Upon exam, Baldwin was in acute distress, appeared ill, and was vomiting. Tr. 672. She was alert and oriented and had normal behavior, thought content, and judgment. Tr. 673. She had a normal range of motion generally and in her neck and normal coordination. Tr. 673. Baldwin was treated with intravenous fluids, pain medication, and nausea medication, and discharged in good condition. Tr. 675.

On January 24, 2020, Baldwin followed up with Dr. Hayes. Tr. 2642. Baldwin reported constant numbness, pain, and aching in her right arm and hand and said that she could "hardly use her right arm at all." Tr. 2642. Her arm had progressively weakened during the three weeks before her appointment. Tr. 2650. Baldwin also reported having 14 migraines so far in January. Tr. 2642. Upon exam, Baldwin had right arm weakness. Tr. 2651. Dr. Hayes assessed Baldwin's depression as "stable, considering circumstances." Tr. 2650.

On January 31, 2020, Baldwin saw Dr. Hayes. Tr. 2658. She reported having 15 migraines that month. Tr. 2658. Dr. Hayes wrote that Baldwin's

11

headaches were related to her neck and noted that Baldwin had an upcoming appointment with Dr. Crowell. Tr. 2666. He assessed Baldwin's depression as "surprisingly[] doing good" considering Baldwin's circumstances and "overall doing excellent." Tr. 2666.

In mid-February 2020, Baldwin had an EMG of her right arm, which showed mild to moderate sensorimotor median neuropathy at the wrist. Tr. 1104. Given Baldwin's "clinical picture, right cervical radiculopathy c[ould] not be excluded." Tr. 1104. A cervical spine MRI showed no evidence of recurrent disc herniation or spinal canal stenosis at the C5-6 level, where she had the surgical procedure; stable moderate-to-severe discogenic disease and posterior disc osteophyte complex at C4-5 causing mild canal stenosis; mild spinal canal stenosis at C3-4 secondary to a small disc bulge; and no significant foraminal narrowing. Tr. 1358–59. There was mild rotary levoconvex scoliosis with facet joint arthropathy. Tr. 1359.

In late February 2020, Baldwin saw Dr. Crowell, who reviewed Baldwin's then-recent imaging. Tr. 1085. Dr. Crowell's exam showed that Baldwin had marked tenderness around the C7 spinous process. Tr. 1088. Her motor exam was "strong and symmetric in all groups with pain inhibition with shoulder abduction." Tr. 1088. She had a normal gait and balance and was alert and cooperative. Tr. 1088. Dr. Crowell assessed status-post cervical spinal fusion, cervical degenerative disc disease, frequent headaches, and right carpal tunnel syndrome. Tr. 1089. He provided referrals to plastic surgery and

12

neurology and commented that Baldwin could, "from the standpoint of her neck," return to work. Tr. 1089. Baldwin was to follow up in three months.

In early March 2020, Baldwin saw Dr. Hayes. Tr. 2672. She reported that a few days before the visit, Dr. Salim started her on new headache medications and increased her Flexeril dosage. Tr. 2672. Dr. Salim believed that Baldwin had cluster headaches. Tr. 2673, 2680. Baldwin said that her neck pain worsened when she used her right arm or hand and that she had right-hand weakness causing her to "almost drop stuff." Tr. 2672. Dr. Hayes wrote that Baldwin "does have carpal tunnel syndrome," for which she had an upcoming appointment. Tr. 2680. He commented that Dr. Crowell felt that Baldwin was "doing fine" post-surgery. Tr. 2680.

In late March 2020, Baldwin saw Dr. Hayes. Tr. 2699. Dr. Hayes noted that Baldwin still had some discomfort post-surgery and was "doing conservative treatment." Tr. 2699. Her new headache medication hadn't helped and she had 15 migraines "in the last month." Tr. 2699. She had an upcoming appointment with her neurologist. Tr. 2699.

In late April 2020, Baldwin had a telephone visit with Dr. Hayes. Tr. 2725. As for her neck, Baldwin reported that she had "some intermittent numbness down the right arm, but overall [was] slightly better." Tr. 2725. She still experienced frequent headaches and had "elected to modify medicine." Tr. 2725. Her depression was "overall doing excellent." Tr. 2725. Dr. Hayes wrote

that "because of the frequent migraines and the neck problems, [Baldwin] will refrain from going to work [one] more month." Tr. 2725.

Later that day, Baldwin had a telephone visit with her neurologist, Dr. Salim. Tr. 1167. Baldwin reported intermittent headaches that could be "very severe, and occur for days at a time." Tr. 1167. Her new medication (Indomethacin) had had not helped and she wasn't sure if she had tried increasing her Flexeril, as Dr. Salim had suggested at the previous visit. Tr. 1166–67. Baldwin's Sumatriptan pills helped, but not always. Tr. 1167. Baldwin said that she was "thinking about being off work until [her] headaches are controlled." Tr. 1167. Dr. Salim stated that it was possible that Baldwin's headaches were cluster headaches, "[g]iven that they can occur in clusters, possibly worse [in the] spring/fall," were associated with "eye involvement, tearing of eye, and very severe pain, without any aura." Tr. 1170. Dr. Salim also indicated that Baldwin instead could be having migraines, or a combination of both types of headaches. Tr. 1170. Because Baldwin's headaches were so severe, Dr. Salim wrote, rather than increasing the Indomethacin dosage, Dr. Salim recommended that Baldwin discontinue Indomethacin and try Diclofenac. Tr. 1170. Dr. Salim also said that Baldwin could try Sumatriptan injections and Ubrogepant. Tr. 1170. Dr. Salim explained that she was "try[ing] to be aggressive with medications since [Baldwin] … need[ed] to take off work due to [the] severity of [her] headaches." Tr. 1170. Dr. Salim also commented that Baldwin's recent cervical spine MRI

14

was "benign" and that Baldwin should try a higher dose of Flexeril for neck pain. Tr. 1170.

In late May 2020, Baldwin had a telephone follow-up visit with Dr. Salim. Tr. 1182. Baldwin's mediation changes were not helping her headaches and she reported having "15 headache days this past month, some very severe, 10/10." Tr. 1182. Baldwin was "very upset" and "getting depressed" about her frequent headaches. Tr. 1182. Separately, she also reported feeling dizzy, off balance, and experiencing gait disturbances when using stairs or walking on her treadmill, "which never used to happen." Tr. 1182. She reported two episodes of confusion. Tr. 1182. Baldwin had "recurrent and worsening" neck and right arm pain that was "sparked" by using her right arm. Tr. 1182–83. Dr. Salim ordered a brain MRI for Baldwin's vertigo-like symptoms to rule out a stroke. Tr. 1186. Dr. Salim stopped Baldwin's then-current medications, other than Baldwin's "usual" Sumatriptan, and prescribed Baclofen (Lioresal) for neck and arm pain. Tr. 1186. Dr. Salim commented that if that medication change wasn't helpful, she would consider Cymbalta or Venlafaxine, which "perhaps will help with [Baldwin's] depression as well, which may be a component" of [Baldwin's] symptoms. Tr. 1187.

In early June 2020, Baldwin saw Dr. Hayes and reported having 24 migraines in May. Tr. 2735. Dr. Hayes noted that Baldwin "[wa[s] seeing [a] neurologist" for her worsening headaches and wrote that "she had discontinued all medicines because she felt it may be aggravating it." Tr. 2743. Baldwin still

had severe neck pain and numbness. Tr. 2743. Dr. Hayes listed Baldwin's depression as "stable." Tr. 2743.

A brain MRI taken a week later showed "no acute intracranial abnormalities." Tr. 1193.

A few days later, Baldwin followed up with Dr. Salim. Tr. 1202. Baldwin was tearful and stated that she felt like there was no hope for improvement of her neck pain, which continued to worsen and was "sparked" by Baldwin using her right arm. Tr. 1202–03. Baldwin reported that since her last visit, she had "10 bad headaches, lasting a few hours each." Tr. 1203. She said that she took her medication, went to sleep, and her headaches were "much better to gone after that." Tr. 1203. Baldwin also reported two "milder headaches since [her] last visit." Tr. 1203. She took Tylenol with Benadryl every day to "keep away headaches." Tr. 1203. Dr. Salim commented that Baldwin experienced at least two types of headaches—one associated with pain behind her right eye and one associated with pain in the back of her head and in her neck. Tr. 1203. Dr. Salim observed that Baldwin's headaches "seem[ed] better" than what Baldwin reported at her last visit. Tr. 1203. On exam, Baldwin had a normal affect and was interactive, pleasant, and cooperative. Tr. 1206. She had normal attention, concentration, and speech. Tr. 1206. She had normal coordination, a normal gait, and normal strength and fine-touch sensation. Tr. 1207. Dr. Salim assessed "migraine without aura and without status migrainosus, not intractable," and neck pain. Tr. 1201–02. She prescribed Venlafaxine (Effexor-

16

XR) for neck pain and Ubrogepant (Ubrelvy) as needed for headaches. Tr. 1202. She weaned Baldwin off Baclofen because it was ineffective. Tr. 1202.

On July 2, 2020, Baldwin had a telephonic psychological consultative exam with Jinhui Wang, Psy.D. Tr. 716. Baldwin recounted to Dr. Wang her work history and stated that she was still on leave from work because her "doctor didn't let me back." Tr. 718. Dr. Wang asked Baldwin if she had psychological problems that interfered with her work and Baldwin responded "no." Tr. 718. Baldwin wasn't looking for a job "because [of] '[her] health.'" Tr. 718. Baldwin stated that she had depression from her migraines. Tr. 718. She described difficulties with activities of daily living due to physical issues. Tr. 718. Baldwin said that her husband helped her with showering when her migraines and neck pain "were really bad" and she had daily migraines lasting at least eight hours. Tr. 718. When she gets a migraine, she can't open her eye and she's exhausted. Tr. 718. At the time of the exam, she was on Amitriptyline for migraines. Tr. 718.

Dr. Wang observed that Baldwin appeared sad during the evaluation, but otherwise was alert, responsive, and oriented. Tr. 719. Dr. Wang diagnosed Baldwin with an unspecified depressive disorder. Tr. 720. Dr. Wang opined that Baldwin could understand, remember, and carry out instructions in a work setting and could respond appropriately to supervisors and coworkers. Tr. 721. Baldwin had no impairment in attention and concentration but if her depressive symptoms worsened, they could interfere with her ability to focus

17

and concentrate. Tr. 721. As for Baldwin's ability to handle work pressures, Dr. Wang wrote that Baldwin reported that she had a lot of patience and could handle stress, which was why her employer at McDonald's assigned her work in the kitchen—the most stressful area to work. Tr. 721. Dr. Wang stated that Baldwin's depressive symptoms "could lower her frustration tolerance and put her a bit at risk for workplace pressure at this time." Tr. 721.

On July 7, 2020, Baldwin had a cervical spine x-ray showing her status-post C5-6 surgical procedure in similar alignment compared to prior imaging, without evidence of complication. Tr. 1405–06. Baldwin had moderate intervertebral disc space height loss at C4-5 with associated uncovertebral osteophytes consistent with moderate degenerative disc disease. Tr. 1405–06.

The next day Baldwin saw Dr. Crowell. Tr. 1101. Dr. Crowell stated that it wasn't "at all clear" whether Baldwin's headaches were secondary to her degenerative changes at the C4-5 level, but it was "likely" that her neck pain stemmed for that area. Tr. 1101–02. Dr. Crowell indicated that a fusion at C4-5 was a possibility, but that it probably wouldn't relieve Baldwin's neck pain or headaches. Tr. 1102. Baldwin also reported "some difficulty with balance … that … ha[d] worsened." Tr. 1102. She said that she had "some" right-hand numbness, which Dr. Crowell said was consistent with her previously diagnosed carpal tunnel syndrome. Tr. 1102. Upon exam, Baldwin had widespread tenderness in her cervical spine area and strong, symmetric arm strength with pain inhibition upon shoulder abduction. Tr. 1104. She had a

18

normal gait and normal balance. Tr. 1104. Dr. Crowell ordered a cervical spine MRI. Tr. 1101–02.

In late July 2020, Baldwin had a cervical spine MRI. Tr. 1417–18. The impression was a stable anterior cervical fusion and discectomy at C5–6 when compared to Baldwin's February MRI. Tr. 1417–18. A broad-based disc osteophyte complex was "again evident" at C4–5 causing mild central and bilateral foraminal narrowing. Tr. 1418. And at C3–4 there was mild central narrowing and mild bilateral foraminal narrowing. Tr. 1418.

In mid-August 2020, Baldwin saw Dr. Crowell for a follow-up. Tr. 1120. Baldwin reported continuing neck pain and migraine headaches and said that she woke up three to four times a night and required her husband's help to complete activities of daily living. Tr. 1120.

Two days later, Baldwin saw Dr. Salim. Tr. 1221. Baldwin reported that her neck and shoulder pain and headaches were making it difficult for her to do things around the house and she and her husband were becoming frustrated by Baldwin's need for help doing chores. Tr. 1222. Baldwin reported that Effexor and Ubrelvy, which Dr. Salim prescribed at Baldwin's last visit, caused stomach upset. Tr. 1222. Baldwin still took Tylenol and Benadryl every day to prevent headaches. Tr. 1222. Dr. Salim mentioned that Baldwin wasn't supposed to take daily pain medication, but Baldwin said that she also took it for her neck pain and didn't know what other options were available for that. Tr. 1222. She had previously tried physical therapy, neck injections, and

various medications. Tr. 1221. Dr. Salim wrote that Baldwin could try muscle relaxers again for her neck and shoulder and "a different NSAID for the shoulders." Tr. 1221. And since Baldwin's headaches "may be partly migrainous," Dr. Salim wrote, Baldwin could try other migraine preventative medications. Tr. 1221. Dr. Salim restarted Baldwin on Baclofen and prescribed Meloxicam (Mobic) and Verapamil (Calan). Tr. 1221. She continued Baldwin's Sumatriptan as needed and wrote that Baldwin should "try to avoid daily pain meds." Tr. 1221. Dr. Salim "wonder[ed] about fibromyalgia" and suggested that Baldwin could try Gabapentin or Lyrica if her newly prescribed medications didn't work. Tr. 1221. Dr. Salim assessed neck pain and noted that Baldwin's recent MRI results were "stable." Tr. 1221. Dr. Salim also assessed anxiety and stated that, although Baldwin denied debilitating symptoms of anxiety, she seemed anxious during her visit. Tr. 1221. Baldwin's carpal tunnel syndrome "seem[ed] asymptomatic" but Dr. Salim noted that Baldwin could try a wrist splint. Tr. 1221.

About a month later, in September 2020, Baldwin followed up with Dr. Salim. Tr. 1242. Baldwin said that she had only two headache-free days "in the past month." Tr. 1242. She was still taking Tylenol and Benadryl every day to prevent headaches; Dr. Salim reiterated her past advice that Baldwin not take daily pain medication; and Baldwin stated that she used it also for neck pain and didn't know what else to take for that. Tr. 1242. Baldwin also reported a new symptom of forearm numbness. Tr. 1241. Dr. Salim increased Baldwin's

existing medications and added Rizatriptan (Maxalt) and Imitrex nasal spray. Tr. 1241. She prescribed a right wrist splint. Tr. 1241. Baldwin denied that anxiety was contributing to her symptoms. Tr. 1241.

In mid-October, Baldwin was fitted for a "cock-up [wrist] splint." Tr. 1426–27.

In early November 2020, Baldwin saw Dr. Salim for a follow-up. Tr. 1261. Baldwin reported that she had headaches most days of the month. Tr. 1262. She said that she couldn't get the Rizatriptan or Imitrex nasal spray that were prescribed at her last visit "due to cost" and the Sumatriptan pills worked well but she "cannot have many pills." Tr. 1261. The Meloxicam and Baclofen had helped some. Tr. 1261. Dr. Salim continued those medications and Baldwin's Amitriptyline and started Gabapentin. Tr. 1261. Baldwin also reported that she took Tylenol for neck pain "sometimes several times." Tr. 1262. Dr. Salim recommended a pain management referral, but Baldwin declined to go because "they mostly recommend injections," which were expensive and had not been helpful. Tr. 1261–62. Dr. Salim wrote that Baldwin's cervical spine MRI showed "some findings but less than what can fully account for [the] severity and persistence of symptoms, for [Dr. Salim] as well as per ortho." Tr. 1261.

A little over a week later, Baldwin saw her primary care physician, Dr. Hayes. Dr. Hayes noted that Baldwin was still having an "excessive amount" of headaches without "much relief" and that her recent MRI showed a

21

prolapsed disc with an osteophyte just below the vertebral level where she had surgery. Tr. 1309. He wrote that Baldwin was receiving conservative treatment for her neck pain and that she saw Dr. Salim for her headaches. Tr. 1309. Dr. Hayes commented that Baldwin's depression was stable. Tr. 1309. Baldwin had right shoulder pain upon exam. Tr. 1310.

In mid-December 2020, Baldwin had a video appointment with Dr. Salim. Tr. 1285. Baldwin said that Gabapentin improved her neck pain but she couldn't take more than three or four pills twice a day because more than that made her sleepy. Tr. 1285. Verapamil was "may[]be" helping her headaches and she hadn't tried Meloxicam "much" but that, too, was "maybe some help." Tr. 1285. Amitriptyline seemed to help because when Baldwin didn't take it, she had "much more" migraines. Tr. 1285. Sumatriptan worked well if Baldwin "c[aught] [her headaches] early enough" but she couldn't use many pills because they were expensive. Tr. 1285, 1290. Baldwin still reported having headaches most days of the month. Tr. 1285. She denied weakness or numbness. Tr. 1285. Dr. Salim assessed myalgia and again commented that Baldwin declined a pain management referral and that fibromyalgia was a possibility. Tr. 1290. Dr. Salim opined that Baldwin "seem[ed] to have allodynia[4] also" and that Gabapentin was helping. Tr. 1290. Dr. Salim adjusted

---

[4]   Allodynia is pain from stimuli that doesn't normally produce pain. *See* https://americanmigrainefoundation.org/resource-library/what-to-know-about-allodynia/ [https://perma.cc/9CEF-9ZQ8]

Baldwin's medications and advised Baldwin to try to limit her over-the-counter pain medication consumption to no more than two days a week. Tr. 1290.

About a week later, Baldwin saw Dr. Hayes. Tr. 1324. Baldwin reported that Gabapentin was helping her neck pain and headaches. Tr. 1324. Dr. Hayes assessed Baldwin's depression as stable and wrote that Baldwin should "maintain her medications." Tr. 1324.

In January 2021, Baldwin saw Dr. Hayes. Tr. 1335. Baldwin reported neck pain, which cause headaches, and that her medication wasn't helping. Tr. 1335. She also described "excruciating" pain radiating down the middle of her back and arms. Tr. 1335. Her depression was getting worse because she was stressed due to financial problems and she requested medication to manage her depressive symptoms. Tr. 1335. Dr. Hayes commented that Baldwin was on a large dose of Neurontin (Gabapentin) and Elavil and that a psychiatry referral would be necessary if Baldwin's depression continued. Tr. 1342. On exam, Baldwin was alert and oriented, appeared well, and had a decreased range of motion in her neck. Tr. 1343. Dr. Hayes referred Baldwin for a second opinion about her neck pain "so as to basically put [Baldwin] at ease" about her options for treating her neck. Tr. 1342.

In February 2021, Baldwin followed up with Dr. Hayes. Tr. 2763–64. Dr. Hayes wrote that Baldwin's depression was stable and her shoulder pain was unchanged. Tr. 2764. He referenced Baldwin's upcoming appointments with Dr. Salim and a neurosurgeon. Tr. 2764.

23

In early March 2021, Baldwin saw Dr. Salim for neck and upper shoulder pain without radiation into her arms. Tr. 1475. Dr. Salim increased Baldwin's Verapamil and Amitriptyline and continued Gabapentin. Tr. 1477. Baldwin "d[id]n't want to try" physical therapy because it previously made her pain worse, and she didn't want to see pain management "since they try injections" and injections were expensive and hadn't helped. Tr. 1475, 1477.

In late March 2021, Baldwin saw Christian L. Bonasso, M.D., for a neurosurgical consult and second opinion for neck and shoulder pain.[5] Tr. 1349–52.

In April 2021, Baldwin had right shoulder x-rays, which were unremarkable. Tr. 1458. Baldwin saw Dr. Salim complaining of neck pain, right shoulder pain, migraines, and diffuse myalgias in her legs and thighs. Tr. 1487–88. Dr. Salim remarked that she agreed with Dr. Bonasso's opinion that Baldwin's cervical spine MRI findings didn't account for the degree of pain Baldwin experienced. Tr. 1487. A right shoulder MRI was recommended. Tr. 1487. Dr. Salim commented that, while Baldwin possibly had fibromyalgia, it was unusual for fibromyalgia symptoms "to be mostly one-sided." Tr. 1487. On exam, Baldwin was interactive, pleasant, and cooperative and had a normal affect, attention, concentration, language, and speech. Tr. 1494. She had a

---

[5] In her brief, Baldwin points out that only four out of six pages from Baldwin's visit with Dr. Bonasso are in the "official transcript." Doc. 9, at 15; Tr. 1349–52. But at the hearing, Baldwin's counsel confirmed that the transcript was complete. Tr. 43–44.

24

normal gait, no abnormal movements, and she moved her arms and legs well and symmetrically. Tr. 1495. Dr. Salim prescribed a TENS unit and explained that they could adjust Baldwin's medications one at a time and there were other medications, like Lyrica, that Baldwin could try. Tr. 1488. Dr. Salim mentioned natural pain management therapies and techniques but Baldwin "was not keen on these." Tr. 1488. Dr. Salim assessed Baldwin's headaches as "other headache syndrome—likely cervicogenic and/or tension component" and "migraine without aura suspected, superimposed on above." Tr. 1488. She noted that Baldwin "often wakes with them" and that some of Baldwin's headaches "seem to be cluster-like" with "eye involvement." Tr. 1488.

In June 2021, Baldwin saw Dr. Hayes. Tr. 2777. Baldwin said that her neck pain had worsened—she rated her pain a seven out of ten "all the time" and she had nausea. Tr. 2777. She was fighting with her insurance company to pay for the shoulder MRI that Dr. Bonasso ordered. Tr. 1499, 2777. She had 31 migraines—"almost everyday"—"last month." Tr. 2777. Baldwin reported that her medications had been adjusted "a lot" and a recent increase in Amitriptyline caused her to feel "wobbly." Tr. 2777. She had pain and "popping" in her ear and back pain. Tr. 2777. She said that she couldn't use her right arm because the more she used it the worse her neck pain got. Tr. 2777. Dr. Hayes remarked that Baldwin was trying various medications prescribed by Dr. Salim and that "once again cost is prohibitive and insurance ha[d] not been willing to cover." Tr. 2784. Dr. Hayes assessed Baldwin's depression as stable

and Baldwin's shoulder pain as unchanged. Tr. 2784. Dr. Hayes thought that Baldwin's ear pain was most likely from sinuses and prescribed Flonase. Tr. 2784.

The next day, Baldwin saw Dr. Salim. Tr. 1499. Baldwin wasn't taking her Verapamil as prescribed. Tr. 1500. Dr. Salim adjusted Baldwin's medications. Tr. 1499–50.

### 2.  *State agency opinions*[6]

In July 2020, Vicki Warren, Ph.D., reviewed Baldwin's record and opined that Baldwin did not have a severe mental impairment. Tr. 66. In September 2020, Paul Tangeman, Ph.D., reviewed Baldwin's record and agreed with Dr. Warren's opinion. Tr. 74–75.

In July 2020, Elizabeth Das, M.D., reviewed Baldwin's record and assessed Baldwin's physical residual functional capacity (RFC).[7] Tr. 67–69. Dr. Das opined that Baldwin could sit, stand, and walk for about six hours in an

---

[6]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[7]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

eight-hour workday. Tr. 68. Baldwin could frequently lift 10 pounds and occasionally 20 pounds. Tr. 67. She could occasionally reach overhead and had postural and environmental limitations. Tr. 68–69. In September 2020, Michael Lehv, M.D., reviewed Baldwin's record and agreed with Dr. Das's assessment. Tr. 76–78.

### 3. *Hearing testimony*

Baldwin, who was represented by counsel, testified at the telephonic administrative hearing held in August 2021. Baldwin stated that she lives with her husband, who is retired. Tr. 45–46. She has a driver's license Tr. 46.

Baldwin explained that she last worked in April or May 2019 at a fast-food restaurant. Tr. 47. She worked in the kitchen and lifted and carried 50 pounds. Tr. 47. Baldwin stopped working because of extreme pain in her neck. Tr. 47–48. The pain radiated down her arm, so then she couldn't "move [her] arm because the pain was so … intense." Tr. 48. She had received a series of neck injections in 2017, but they didn't help. Tr. 49. Meanwhile, her pain worsened. Tr. 49.

Baldwin had surgery on her neck in September 2019, but the surgery didn't help. Tr. 48–49. Her migraines are worse, she "has no use of [her] right arm," and she is in more pain than she could "ever imagine[]" throughout her neck and right arm. Tr. 49. She has numbness and tingling down her spine. Tr. 49. She "can't do anything with [her] right side" and tried to do everything with her left, non-dominant hand. Tr. 49–50. Even so, Baldwin's neck pain

27

"stays about a seven." Tr. 50. She can't do anything that she did before. Tr. 49. Her husband pours her juice and she drinks it using a straw. Tr. 49. Her hand trembles. Tr. 49. Her husband helps her shower. Tr. 49.

When asked if there were other treatment options available, Baldwin said no. Tr. 50. She has 30 to 35 migraines a month. Tr. 50. She is on "all different kinds of medications, which all … have side effects." Tr. 50. There are other medications she can try, but she either can't afford them or "there's absolutely nothing." Tr. 50. She was told that if she has another surgery her condition will be worse. Tr. 50. If Baldwin wakes up in the morning with a migraine, she takes her migraine medication and is in bed the rest of the day because the medication makes her drowsy. Tr. 50. She has dizzy spells and collapses. Tr. 50. She lives in a small, one-story house with chairs spaced out so that she can sit down. Tr. 50–51. Someone is always with her. Tr. 51.

Baldwin said that her migraines last for at least seven hours. Tr. 51. It isn't uncommon for her to wake up with a headache and then have another one at the end of the day. Tr. 51. The problem, Baldwin explained, is that she's limited in the amount of medication she can obtain "from the insurance and through other places." Tr. 51. If it gets too extreme, she goes to the emergency room to get an injection and "[her] husband has to basically physically carry [her] to the car." Tr. 52. When asked if she sees a specialist for her headaches, Baldwin stated that she sees her primary care doctor and a neurologist. Tr. 52.

28

The neurologist prescribed a particular medication that was unaffordable. Tr. 52.

Baldwin described a typical day. Tr. 52. If she woke up without a migraine, she still had pain. Tr. 52. Baldwin's husband makes coffee because Baldwin doesn't have the hand strength to pour water into the coffee pot. Tr. 52. Her husband makes her breakfast. Tr. 52. Baldwin takes her medication, and if she's "still okay" she showers and her husband washes her hair and helps her get dressed. Tr. 52–53. By then Baldwin is nauseous, so she lies down on the heating pad or recliner and tries to rest. Tr. 53. Her husband does all the chores. Tr. 53. Baldwin doesn't go anywhere because she gets drowsy, and then she gets depressed. Tr. 53. She takes Amitriptyline for depression, which helps "a little." Tr. 53.

When asked if she had treatment for her carpal tunnel syndrome, Baldwin said no. Tr. 54. She went to a carpal tunnel specialist, who told her that it was "all in [her] neck." Tr. 54. Baldwin explained that when she moves her arm away from her body it felt like a knife in the back of her neck. Tr. 55. Within ten minutes the pain will radiate to her head and she develops an "enormous" migraine. Tr. 55.

The ALJ discussed with the vocational expert Baldwin's past work as fast-food worker, vending machine attendant, and deli worker. Tr. 56–57. The ALJ asked the vocational expert to determine whether Baldwin could perform her past work if she had the limitations assessed in the ALJ's RFC

29

determination, described below. Tr. 57. The vocational expert answered that such an individual could perform Baldwin's past job as a fast-food worker, not as Baldwin had performed it but as it was performed in the national economy. Tr. 57–58.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2024.
>
> 2.   The claimant has not engaged in substantial gainful activity since October 1, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3.   The claimant had the following severe impairments: degenerative disc disease of the cervical spine status post anterior cervical discectomy and fusion (ACDF, 10/25/2019); migraines/vascular headaches (20 CFR 404.1520(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) except only occasional climbing of ramp and stairs, stooping, kneeling, crouching, crawling; frequent balancing; no climbing ladders, ropes, and scaffolds; occasional overhead work bilaterally; no work around hazards such as dangerous machinery or unprotected heights and no commercial driving.

6. The claimant is capable of performing past relevant work as a fast food worker as generally performed but not actually performed. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2017, through the date of this decision (20 CFR 404.1520(f)).

Tr. 26–39.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the

31

4.     What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.     Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which

"a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

1.    *The ALJ didn't err at step two*

Baldwin argues that the ALJ erred when she found that Baldwin's carpal tunnel syndrome and depression were not severe impairments. Doc. 9,

33

at 19. At step two of the sequential evaluation, the ALJ determines whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A *severe* impairment is one that significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). An impairment is "not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds *severe* and *non-severe* impairments at step two and continues with the subsequent steps in the sequential evaluation process, any error at step two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is harmless error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *see Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) ("The fact that some of Anthony's impairments were not deemed to be severe at step two is…legally irrelevant" because the ALJ considered Anthony's severe and non-severe impairments in the remaining steps of the analysis) (citing *Maziarz*); *see also Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by all of an individual's impairments,

even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5).

*Carpal tunnel syndrome*

The ALJ found that Baldwin's carpal tunnel syndrome in her right wrist was a *non-severe* impairment. Tr. 21. The ALJ recognized that Baldwin had been diagnosed with carpal tunnel syndrome on her right wrist through an EMG. Tr. 21. But the ALJ remarked that cervical radiculopathy could not be excluded as the source of that problem and that an updated cervical spine MRI "showed a reduction of the disc protrusion at C5-6 with the same changes at C4-5 and C3-4 but without stenosis or cord compromise." Tr. 21. The ALJ noted that Baldwin's surgeon said that Baldwin "could return to normal activity." Tr. 21. The ALJ commented that Baldwin had conservative treatment for her carpal tunnel syndrome and explained:

> the many normal findings as to the claimant's hands/fine motor testing support no more than a minimal effect on her functioning and work-related abilities. With some exceptions later regarding her right shoulder and cervical spine recovery, the record documents findings such as normal extremity strength in her legs and hands, normal motor skills, normal sensation, normal reflexes, intact cranial nerves, no weakness, no sensory deficits, normal gait and ambulation, normal push/pull, normal bilateral grip strength, and a normal mood, with symptoms not regularly reported throughout the record (see e.g., 3F/27, 5F/235, 15F/268).

Tr. 21.

Baldwin reiterates that she was diagnosed with carpal tunnel syndrome, Doc. 9, at 19, but "the mere diagnosis [of a condition] … says nothing about the severity of the condition." *Higgs*, 880 F.2d 860 at 863 (affirming the Agency's step two finding); *see also Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 589 (6th Cir. 2019). Baldwin concedes that Dr. Salim opined that Baldwin's carpal tunnel syndrome was asymptomatic. Doc. 9, at 19 (Tr. 1221). Baldwin submits that Dr. Salim offered Baldwin a wrist splint, Doc. 9, at 19, but that doesn't change the fact that Baldwin had only conservative treatment, was cleared to return to "normal activity," Tr. 957, and had generally normal exam findings, which the ALJ detailed, Tr. 21, and which Baldwin does not dispute. Indeed, Baldwin testified that she had no treatment for her carpal tunnel syndrome and that the problem was "all in [her] neck." Tr. 55. The ALJ's step two finding *non-severe* Baldwin's carpal tunnel syndrome is supported by substantial evidence.

Moreover, the ALJ considered and discussed evidence of Baldwin's carpal tunnel syndrome when assessing Baldwin's RFC, Tr. 28–29, 31, so even if the ALJ erred at step two, any error would be harmless. *See Anthony*, 266 F. App'x at 457; *Maziarz*, 837 F.2d at 244. Baldwin alleges that the ALJ "fail[ed] to adequately consider the limiting effects of" Baldwin's carpal tunnel syndrome in her RFC assessment. Doc. 9, at 21. But Baldwin doesn't identify legal authority requiring or defining "adequate[] consider[ation]" or persuasively explain how the ALJ's evaluation here was inadequate. Indeed,

in her RFC explanation, the ALJ commented that Baldwin was diagnosed with carpal tunnel syndrome and reported some hand numbness "consistent with carpal tunnel syndrome." Tr. 29. The ALJ observed that Baldwin nevertheless had "strong and symmetric" motor exam findings the day she reported numbness and at other times in the record. Tr. 29. And the ALJ discussed Baldwin's written function report, observing:

> It should be noted that the claimant was able to write these very detailed and very legible answers herself in a report that she admitted writing (7E), and admit[ed] to be[ing] right-handed at the hearing, while she alleges an inability to use that right hand.

Tr. 31; Tr. 372–79.

Baldwin doesn't challenge the ALJ's factual findings. Her citations to treatment notes showing shoulder pain and right arm pain radiating from her neck, Doc. 9, at 21 (citing Tr. 667, 2627, 2777), don't equate to carpal tunnel syndrome. The ALJ discussed Baldwin's right shoulder and arm pain and Baldwin's alleged related limitations. Tr. 25, 27–30.

Baldwin hasn't shown that the ALJ erred at step two when evaluating Baldwin's carpal tunnel syndrome.

*Depression*

The ALJ found that Baldwin's depression was *non-severe*. Tr. 21–23. The ALJ detailed Baldwin's "largely normal" mental status exam findings, treatment notes showing that Baldwin's depression was at times "stable" and "excellent overall," and Baldwin's conservative, or at times lack of, treatment

for depression. Tr. 21–22. The ALJ thoroughly discussed the consultative examiner's findings and opinions. Tr. 22. The ALJ explained that she found less persuasive the consultative examiner's opinions compared to the opinions of the state agency reviewers, who found that Baldwin had no severe mental health impairments. Tr. 22. And the ALJ explained that she considered the "four … 'paragraph B' criteria"[8] and that Baldwin had no more than a mild limitation in any of the four areas of functioning. Tr. 21.

Baldwin "maintains that her depression is severe at Step Two as her symptoms of this condition worsens with increased pain and more frequent headaches, and the consultative examination confirms that her symptoms would be expected to interfere with her ability to perform work related activity." Doc. 9, at 19. As to the first, the ALJ found that, to the contrary, Baldwin's depressive symptoms had *not* worsened. Tr. 22 ("the record supports no worsening of the claimant's symptoms, but rather stability and control with medications prescribed by her primary care physician"). As to the second, the consultative examiner only opined that Baldwin *could* experience an unspecified amount of difficulty in two functional areas *if* Baldwin's depressive symptoms worsened. Tr. 721. The ALJ cited those two caveats and reasoned

---

[8]     To determine at step two the severity of a mental impairment, the ALJ evaluates four broad functional areas, also known as the "paragraph B criteria": understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § 404.1520a(c); 20 C.F.R Part 404, Subpart P, App. 1, Listing 12.00E. Generally, a finding of "none" or "mild" in all four areas indicates that the impairment is not severe. 20 C.F.R. at § 404.1520a(d)(1).

that, because Baldwin's symptoms didn't worsen, those "caveat[s] do[] not come into play" and were "not applicable." Tr. 22. Baldwin disagrees with the ALJ's conclusion but doesn't describe an error. In fact, at the hearing, Baldwin's attorney listed Baldwin's severe impairments but didn't mention depression. Tr. 44.

Even if it could be said that the ALJ erred, the ALJ considered and discussed evidence of Baldwin's depression when assessing Baldwin's RFC, Tr. 26–28, 30, 32, so any purported error would be harmless. *See Anthony*, 266 F. App'x at 457; *Maziarz*, 837 F.2d at 244.

> 2. *The ALJ properly evaluated Baldwin's migraine symptoms.*

Baldwin challenges the ALJ's evaluation of her migraine symptoms. Doc. 9, at 21. To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven

factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)). The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *10.

Baldwin objects to this statement that the ALJ wrote:

> Notes from her 3/12/19 neurology visit with a new neurologist, reveal that the claimant's former neurologist had advised the claimant to avoid nonsteroidal anti-inflammatory medications (NSAIDs) due to her prior overuse of them, suggesting noncompliance.

Tr. 26. Baldwin explains *why* she was using NSAIDs, Doc. 9, at 22, but her assertion—she used NSAIDs for neck and shoulder pain—is unresponsive to the ALJ's comment. It was Baldwin's "overuse" of NSAIDs that had "suggest[ed] noncompliance."[9]

Later in her decision, the ALJ found:

> The record often documents intact coordination, gross motor testing, muscle strength 5/5, fine touch sensation, normal proprioception, and normal Romberg (with one finding of Romberg without

---

[9]    In her reply brief, Baldwin explains that one of her doctors believed that her overuse of Aleve caused "rebound headaches." Doc. 13, at 5 (citing Tr. 1133, 1508, 1598, 1814, 1612–15, and 2123–33). In any event, Baldwin concedes that she "overuse[d]" Aleve. *Id.*

> significant sway), which is inconsistent with the
> claimant's disability allegations (7F/101). The
> claimant refused to even try pain management
> claiming that they will just recommend injections
> that are costly for her and will not work, and rejected
> other helpful medications claiming that they are too
> expensive. While cost is certainly a factor, the
> overall picture of normal objective findings on exam,
> imaging, and testing, intact and stable findings with
> regard to her status post ACDF, normal neurological
> evaluations, her presentation at most exams, and
> her compliance issues (taking her own Tylenol-
> Benadryl combination to prevent headaches against
> her neurologist's orders and refusing to even try
> pain management due to anticipated
> ineffectiveness), together suggest that her
> symptoms are more tolerable than alleged.

Tr. 29.

Baldwin cites this passage and argues that Dr. Salim "did not outright order [Baldwin] to stop all use of NSAIDs and actually prescribed a NSAID, i.e., Meloxicam, for neck and shoulder pain." Doc. 9, at 22–23 (citing 1221–22). As an initial matter, Baldwin conflates two different types of medications— NSAIDs and other over-the-counter pain medications. In the passage above, the ALJ is talking about Tylenol, an over-the-counter pain medication which isn't an NSAID.[10]

---

[10]     *See, e.g.*, THE CLEVELAND CLINIC, *NSAIDs (Nonsteroidal Anti-Inflammatory Drugs)*, https://my.clevelandclinic.org/health/drugs/11086-non-steroidal-anti-inflammatory-medicines-nsaids [https://perma.cc/F8V6-4AJP] ("Is Tylenol (acetaminophen) an NSAID? No, acetaminophen isn't an NSAID. It relieves pain and reduces fever. But unlike NSAIDs, acetaminophen (like Tylenol®) doesn't reduce inflammation.").

Dr. Salim told Baldwin to restrict her use of over-the-counter pain medication. *See, e.g.*, Tr. 1133 (March 2019, "Consider taking ibuprofen[11] for headache, no more than 600mg at a time, no more than a few times in a day, no more than a few days in a week); Tr. 1290 (December 2020, "Try to limit [over-the-counter] pain meds to no more than [two] days per week"). Nevertheless, Baldwin regularly reported to Dr. Salim that she took Tylenol with Benadryl "'every day to 'keep away' headache[s]." Tr. 1203 (June 2020); *see also* Tr. 1222 (August 2020 record: "[Baldwin] still takes [T]ylenol with [B]enadryl every day to 'keep away' headache[s]—discussed with her not to take daily pain meds in the past"); Tr. 1242 (September 2020 record) (same). Indeed, Baldwin concedes that Dr. Salim recommended that she not take daily pain medication. Doc. 9, at 23. The ALJ's finding that Baldwin daily took "her own Tylenol-Benadryl combination to prevent headaches against her neurologist's orders" is accurate. The fact that Baldwin believes that she had a good reason to do so, Doc. 9, at 22, Doc. 13, at 5, doesn't change the fact that Dr. Salim reported Baldwin's noncompliance and regularly advised Baldwin to comply.

Next, Baldwin argues that the ALJ's comment about Baldwin refusing to go to pain management "fail[ed] to account" for the fact Baldwin "had tried pain management and injections in her neck without improvement in the past." Doc. 9, at 22–23. The fact that Baldwin had at an unspecified time tried

---

[11]    Ibuprofen is an NSAID. *See supra* n.10.

neck injections without success doesn't mean that a pain management referral had nothing to offer. So the ALJ's statement that the record shows that Baldwin "*refus[ed] to even try* pain management due to anticipated ineffectiveness" is accurate and a sound basis to discount Baldwin's allegations of symptoms.[12] *See, e.g., Roberts v. Comm'r of Soc. Sec.*, No. 4:16-cv-2533, 2017 WL 5501323, at *17 (N.D. Ohio Oct. 19, 2017) (the claimant's unwillingness to try other treatments supported the ALJ's findings that the severity of symptoms was not as severe as alleged).

Finally, the ALJ acknowledged that cost was a factor in Baldwin's treatment regimen, but found that overall the evidence "suggest[ed] that her symptoms are more tolerable than alleged." Tr. 29. The ALJ went on to detail later evidence in the record, including that Gabapentin provided better control of Baldwin's neck pain and headaches and that Baldwin's surgeon found no changes in Baldwin's August 2020 MRI. Tr. 29. The ALJ observed that in early 2021, Baldwin had "only some decreased range of motion of her neck" and that "[r]ight shoulder imaging was completely normal at the hospital." Tr. 29. The ALJ found that "[t]hree separate providers including an orthopedic surgeon and two neurologists found [Baldwin's] symptoms inconsistent with the

---

[12]     The ALJ also accurately stated that in April 2021 Baldwin didn't want to try alternative treatments, either. Tr. 30, Tr. 1488 ("Also discussed natural pain relief therapies and techniques as alternatives/add[]itive to pills, though she was not keen on these."). And the ALJ commented that Baldwin "discontinued all her medications" shortly after Dr. Salim started her on new a medication. Tr. 28 (citing Tr. 997).

objective evidence on imaging, and [Baldwin's] findings throughout the record have been mild to normal, other than around the time of her ACDF[13] and recovery period." Tr. 31. The ALJ concluded that, "[w]hile [Baldwin's] complaints of severe and frequent headaches continued, her objective findings on exam, testing and imaging remained stable and within normal limits with the exceptions covered above." Tr. 30. The ALJ explained:

> Thus, [Baldwin's] own reports to providers and her intact physical findings contradict many of her disability reports. She has demonstrated an intact gait at nearly every single exam and denied any problems, yet asserts she has difficulty walking. Other than a few exceptions, she has denied problems with balance and been found to have intact gait, stance, coordination, and balance, and had a negative Romberg. She has intact strength in her upper extremities throughout most of the record, with some few exceptions of give-way strength and shoulder only reduced strength at 4+/5, also nearly normal. There is no support for the inability to lift and carry more than a few pounds and the extent of limitations in disability reports.

Tr. 30. The ALJ commented that Baldwin "indicates nearly daily migraines of long duration yet visits with providers show an intact presentation with normal mental status exam findings, [Baldwin] in no acute distress, and typically pleasant, cooperative, interactive, and alert, other than the earlier emergency department visits largely prior to her ACDF." Tr. 31. The ALJ observed that Baldwin completed her function report with "very detailed and

---

[13]    The ALJ used this initialism for "anterior cervical discectomy and fusion." Tr. 20.

very legible answers" despite stating that she was unable to use her right hand. Tr. 31. The ALJ explained why she credited the state agency reviewers' opinions, Tr. 31, which Baldwin doesn't challenge. In short, the ALJ's evaluation of Baldwin's symptoms was not improper or inaccurate.

Baldwin argues that the ALJ's comment about Baldwin's work restriction was erroneous. Doc. 9, at 22. I disagree. The ALJ wrote that on April 24, 2020, Baldwin "reported that *she* is thinking of being off work until her headaches are controlled (7F/41), which contrasts with her report that her doctor kept her off work (4F)." Tr. 28. Baldwin concedes that she told Dr. Salim on April 24, 2020, that *she* was thinking of being off work until her headaches were controlled, but also points out that on the same day Dr. Hayes commented that *he* would keep Baldwin "off work for another month due to her persistent neck pain and headaches." Doc. 9, at 22 (citing Tr. 2725). But the transcript page that the ALJ cited, 4F, was Baldwin's consultative exam on July 2, 2020. Tr. 716, 718. At that exam, which was over a month after Dr. Hayes's one-month work restriction expired, Baldwin told Dr. Wang that she was "[s]till on medical leave, doctor didn't let me back." Tr. 718. The evidence supports the ALJ's finding that Baldwin's statement to Dr. Wang was inconsistent with the evidence.

Baldwin complains that the ALJ makes "several references to normal neurological examinations" but asserts that (1) her neurologist didn't indicate that Baldwin was having "an active migraine during visits" and (2) abnormal

neurological findings were not indicated "even when [Baldwin] was seen in the emergency department on numerous occasions in acute distress and obvious pain from headaches." Doc. 9, at 23. Baldwin contends that the ALJ didn't "build a logical bridge when discussing normal neurological examinations and an explanation as to why those findings prove to be inconsistent or unsupportive of what is otherwise a deep-seated history of migraines." Doc. 13, at 2.

Baldwin concedes that neurological findings are relevant to migraines. *Id*.; *see also* Soc. Sec. Ruling 19-4p, *Evaluating Cases Involving Primary Headache Disorders*, 2019 WL 4169635 (S.S.A. Aug. 26, 2019). Moreover, Baldwin and multiple providers opined that Baldwin's migraines and headaches likely or possibly stemmed from her cervical spine impairment, as the ALJ noted, Tr. 27, 30, so Baldwin's neurological findings were also relevant for that additional reason. *See, e.g.*, Tr. 886, 2635 (Dr. Hayes); Tr. 1488 (Dr. Salim); Tr. 1101 (Dr. Crowell); Tr. 55 (Baldwin's testimony). And the ALJ found that Baldwin's cervical spine imagining didn't explain her neck and other pain, as multiple providers had also found. Tr. 29–30, 31. Finally, Baldwin had at times alleged dizziness, gait disturbances, and falls, *see* Tr. 55, 1182, and the ALJ explained that Baldwin's intact neurological findings undercut those allegations, Tr. 28, 30. The ALJ, therefore, adequately explained how Baldwin's neurological findings were relevant.

In her reply brief, Baldwin cites *Wessel v. Colvin*, No. 4:14-cv-55, 2015 WL 5036775 (S.D. Ind. Aug. 4, 2015), as holding that an ALJ "committed a reversible error by relying on a normal CT scan, MRI, and unremarkable neurological examinations to omit any work-related [restrictions] for the claimant's migraine headaches, without a logical connection." Doc. 13, at 3. But in *Wessel,* the court found that the ALJ "did not specifically discuss how [migraines] affect [Wessell's] ability to work or why no accommodations were appropriate to address their effects." 2015 WL 5036775, at *6. The court remarked that the ALJ only expressed "an apparent belief that [migraines] must not be as bad as … Wessel said they were because no [neurological] tests [or MRI] confirmed their rate of occurrence or severity." *Id*. The court stated that there was "nothing in the RFC that addresses limitations because of … Wessel's migraines." *Id*. at *4.

Here, in contrast, the ALJ's RFC addressed Baldwin's migraines—the ALJ limited Baldwin to no hazards "due to her headache complaints." Tr. 31. And the ALJ's RFC limiting Baldwin to "light" work was also based in part on Baldwin's migraines. Tr. 31; *see also* Tr. 68, 76 (state agency reviewers' opinions). Also, unlike the ALJ in *Wessell*, the ALJ here didn't rely only on negative neurological findings and he also cited Baldwin's non-compliant treatment, inconsistent statements, and intact mental exam findings despite contemporaneous allegations of "very high pain levels 8-10/10." Tr. 25–31. Finally, neurological findings are relevant in Baldwin's case because Baldwin

and multiple providers opined that Baldwin's migraines and headaches likely or possibly stemmed from her cervical spine impairment, as described above. Notably, the claimant in *Wessell* didn't allege a related spinal impairment. 2015 WL 5036775, at *3 (listing the claimant's alleged impairments as knee problems, migraines, depression, and anxiety).

Finally, Baldwin submits that the ALJ "failed to acknowledge well-documented reports of headaches in excess of 15 per month and often nearly daily despite compliance with treatment." Doc. 9, at 23; Doc. 13, at 4. This argument fails. First, the ALJ found that Baldwin wasn't always compliant with treatment, as discussed above. Second, the ALJ acknowledged that Baldwin reported "30–32 headaches a[ ] month." Tr. 29. *See also* Tr. 31 (ALJ stating that she reviewed Baldwin's 2020 headache journal showing "nearly daily migraines of long duration"). The ALJ also discussed the severity of Baldwin's headaches. Tr. 26, 29 (describing Baldwin's emergency room behavior in 2018 and 2019 indicating distress); 30 (stating that Baldwin's "complaints of severe and frequent headache[]s continued" in 2021). So the ALJ "acknowledge[d]" the frequency and severity of Baldwin's headaches. In fact, the ALJ observed that, despite Baldwin's complaints of near-daily, severe headaches:

> visits with providers show an intact presentation with normal mental status exam findings, the claimant in no acute distress, and typically pleasant, cooperative, interactive, and alert, other than the earlier emergency department visits largely prior to her [cervical spine surgery] (15E).

48

Tr. 30; *see also* Tr. 31 ("Given the frequency and duration of [Baldwin's] reported headache symptoms, the very normal mental status exam findings and intact neurological evaluations throughout the record are not consistent").

For all these reasons, the ALJ didn't err when evaluating Baldwin's migraine symptoms and the ALJ's decision is supported by substantial evidence. So it must be affirmed.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: August 8, 2023

  */s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).